FILED

2020 Jul-24  PM 02:14
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| BARBARA ETHERIDGE, | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| v. | } | Case No.:  7:18-CV-00905-RDP |
| | } | |
| THE BOARD OF TRUSTEES OF THE | } | |
| UNIVERSITY OF WEST ALABAMA, | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

This case is before the court on Defendant's Motion for Summary Judgment. (Doc. # 30). The Motion has been fully briefed (Docs. # 31, 36, 46) and is under submission. After careful review, and for the reasons discussed below, Defendant's Motion (Doc. # 30) is due to be granted.[1]

## I.    Background[2]

On January 3, 1992, Plaintiff Barbara Etheridge began her employment at Defendant University of West Alabama ("Defendant" or "the University"), located in Livingston, Alabama, as a Perkins Loan Officer. (Doc. # 32-1 at 13, 16). Her hourly wage was $5.75. (Doc. # 32-1 at 16).

---

[1] Defendant's Motion to Strike (Doc. # 43) is also under submission. The court concludes that Defendant's Motion to Strike (Doc. # 43) is due to be denied. Even considering the entirety of Plaintiff's Affidavit, the court has determined that Defendant's Motion for Summary Judgment is due to be granted.

[2] The facts set out in this opinion are gleaned from the parties' submissions and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial.  *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

At all relevant times, the University determined employee wages by weighing specific factors, including: (1) qualifications; (2) quality of work; (3) longevity; (4) knowledge, skill, and ability; (5) experience; and (6) budgetary constraints. (Doc. # 32-2 at 33; Doc. # 32-5 at 33). The University based pay-raise decisions on "equity and longevity calculations," which are evaluated each fiscal year. (Doc. # 32-1 at 68).

> Longevity calculations are based on the number of years an employee is employed with the University. Equity is based on the market value of the position and the employee's current position. The amount of funds that go into this calculation is based off of the amount that faculty members have gotten through promotion and tenure or increased credentials. . . . Whatever dollar amount that is, the staff has allocated a percentage, and then that percentage is then divided out among the staff positions.

(Doc. # 32-1 at 68-69). Even taking all of this into account, the number and amount of pay increases that could be awarded at any given time were constrained by budgetary limitations. (Doc. # 32-1 at 70).

In September 1993, Plaintiff was promoted to a Student Accounts Clerk. She held that position until January 1994 and maintained the same hourly wage of $5.75. (Doc. # 32-1 at 16). In January 1994, Plaintiff was promoted to Student Account Supervisor. (Doc. # 32-1 at 17). Her hourly wage was increased to $8.15. (Doc. # 32-1 at 17). She remained in this position until September 2003, at which time she was promoted to Accounting Supervisor. (Doc. # 32-1 at 17). Plaintiff's hourly wage was initially increased to $14.17. (Doc. # 32-1 at 18). While employed in the Accounting Supervisor position, her hourly wage increased several times: to $26.36/hour in September 2013; and to $26.54/hour in September 2014. (Doc. # 32-1 at 18; Doc. # 40-5; Doc. # 40-21 at 1).

In the position of Accounting Supervisor, Plaintiff's supervisor was George Snow, who (at that time) was the Comptroller. (Doc. # 32-1 at 27). In 2014, Snow fell ill and could not

perform his duties as Comptroller; he was often too sick to work and was frequently out of the office. (Doc. # 32-1 at 28-29, 117). Because of this, Plaintiff performed many of Snow's duties (in addition to her own) to maintain proper operations. (Doc. # 32-1 at 28-29). At this time, and while undertaking these additional duties, Plaintiff's hourly wage equaled an annual salary of $59,144.00. (Doc. # 32-5 at 37).

In July 2014, Snow retired after serving as the Comptroller for 27 years.[3] (Doc. # 32-1 at 27-28). At the time of his retirement, Snow's annual salary was $99,822.00. (Doc. # 32-6 at 1-2, ¶ 3). Before Snow retired, however, Raiford Noland, the then-Vice President of Financial Affairs, hired Karen VanLuvender to "assist" Plaintiff in completing some of the duties and responsibilities of Comptroller, such as preparing financial statements. (Doc. # 32-1 at 28, 38; Doc. # 47-1 at 2, ¶ 4). VanLuvender still works part-time for Defendant and assists Plaintiff with certain duties. (Doc. # 32-1 at 27-28).

On February 8, 2015, Noland promoted Plaintiff to the position of Comptroller.[4] (Doc. # 32-1 at 18, 26; Doc. # 32-5 at 37; Doc. # 40-4). Plaintiff's hourly wage increased to $29.42—a 10.87% increase.[5] (Doc. # 32-1 at 19; Doc. # 40-6; Doc. # 47-1 at 1-2, ¶ 3). As Comptroller, Plaintiff's duties included, among other things, student accounts, accounts payable and receivable, tax preparation, collections, budget control, financial reporting, and software

---

[3] In 2006, Snow's annual salary as Comptroller was $80,213.00 (after serving 18 years in that position). (Doc. # 32-6 at 1, ¶ 3). In her deposition testimony, however, Plaintiff admits that she does not know what Snow's annual salary was when he first became Comptroller, nor does she know what his annual salary was throughout his tenure. (Doc. # 32-1 at 38).

[4] Tucker testified that, before her promotion, he recommended to Noland that he "seriously consider moving [Plaintiff] into . . . [the Comptroller] position with a pay raise." (Doc. # 32-5 at 38).

[5] In relation to the "market value" of the Comptroller position, Edmonds testified that it was "lowered by [] Noland in February 2015 . . . , well before [Plaintiff] made any complaint about her pay [to him]. The adjustment was made pursuant to a pre-established value developed by a third party several years [prior] that is based, in part, on the person's years of experience in the position. Since 2015, the market value of [Comptroller] has increased annually consistent with the Consumer Price Index. Additionally, with each five years that [Plaintiff] holds the position, the market value will increase 3% over the Consumer Price Index." (Doc. # 47-1 at 2, ¶ 5).

development (for budgeting purposes in each department).[6] (Doc. # 32-1 at 36-27, 45; Doc. # 40-2). In the Spring of 2017, Plaintiff also helped with training administration staff on the new budget system. (Doc. # 32-3 at 26).

Effective June 1, 2017, Plaintiff switched from being an hourly employee to a salaried employee. (Doc. # 32-1 at 19; Doc. # 40-8). With this change, Plaintiff's annual salary was raised to $75,000—a 15.75% increase.[7] (Doc. # 32-1 at 19; Doc. # 40-8; Doc. # 47-1 at 1-2, ¶ 3).

As Comptroller, Plaintiff's supervisor is Lawson C. Edmonds, the Vice President of Financial Affairs for the University. (Doc. # 32-2 at 8). Edmonds served in that position in an interim capacity from January 2017 until January 2018, when he became full time. (Doc. # 32-2 at 9). Edmonds replaced Nolan. (Doc. # 32-3 at 16-17). As of September 13, 2019, Edmonds's annual salary was $135,000, which is approximately $15,000 less than Nolan's salary was at the time of his death, and Nolan had been the University's Vice President of Financial Affairs for more than 30 years. (Doc. # 32-6 at ¶¶ 4-5; Doc. # 40-9).

In the Spring of 2017,[8] Plaintiff met with Edmonds and requested an increase to her salary, noting the disparity between her salary and that of her predecessor, Snow. (Doc. # 32-1 at

---

[6] Plaintiff testified that the software development aspect of her job was a duty that was added to the Comptroller position after she was promoted (*i.e.*, after Snow retired). (Doc. # 32-1 at 37). Additionally, as Comptroller (and at the request of Edmonds), Plaintiff prepared budget reports, which was a duty previously reserved for the Vice President of Financial Affairs; not the Comptroller. (Doc. # 32-1 at 51-53). Plaintiff also testified that even before she became Comptroller, she was "reconcil[ing] all [T]itle IV accounts and prepar[ing] … G5 drawdowns on a quarterly basis" for federal funding—but this was already a duty generally reserved for the Comptroller. (Doc. # 32-1 at 50, 54).

[7] Edmonds testified that he approached Plaintiff in the Spring of 2017 and asked her if she would like to move from hourly to salaried. (Doc. # 32-3 at 27). This timeframe corresponds to when Plaintiff was switched to a salaried employee and began making $75,000, annually. (*Id.* at 28). Edmonds testified that he came up with this number by going "back and look[ing] at what she had made the year before by working overtime," which was around $71,000. (*Id.*). So Edmonds "gave her a boost to cover what [he] thought [Plaintiff] could possibly do – make more than she would in overtime," and that was the last time they discussed salary rate until the following year. (*Id.*).

[8] This date is unclear in the Rule 56 record. In Plaintiff's deposition, she testified that she first spoke to Edmonds on March 13, 2018 (Doc. # 32-1 at 86); however, Edmonds and Tucker testified that the first time Plaintiff spoke to Edmonds was in the Spring of 2017. (Doc. # 32-3 at 27; Doc. # 32-5 at 19).

81-84, 86). She also provided Edmonds with a list of comparable positions and salaries at other Alabama state institutions, including the University of North Alabama, Jacksonville State University, the University of Montevallo, Alabama A&M, Troy University, and the University of South Alabama.[9] (Doc. #32-1 at 81, 101-07; Doc. # 40-22 at 5). In response to her request, Edmonds told her that he had already spoken to Kenneth Tucker -- the President of the University -- "about her salary and [her] increased workload," and that he "planned to discuss it again during the budget proceedings." (Doc. # 32-1 at 86). Edmonds also told her he did not believe he could get her salary to what Snow's was, but that he "was hoping to get [her] $10,000 more." (Doc. # 32-1 at 86).

On March 20, 2018, Plaintiff met with Edmonds again. He told her that, after speaking with Tucker, they realized they could not give her a pay increase until the next budget year, but that she would receive a raise because the University values "her contributions . . . and [they] wanted to honor her request if [they] could reasonably and fairly do so." (Doc. # 32-1 at 89; Doc. # 32-3 at 32; Doc. # 32-5 at 31). Importantly, around this same time, the University was "going through a severe budgetary crisis," and "no other employee was being [given] [a] raise[]."[10] (Doc. # 32-5 at 22). Tucker testified that "[t]he [U]niversity was losing between 3.8 million and 5.8 million dollars a year for the last six or seven years. That [was] the situation that [his] administration inherited." (Doc. # 32-5 at 23; Doc. # 40-23 at 5, ¶ 12). The financial records that

_____

[9] Edmonds testified that the institutions Plaintiff referenced were not comparable because they are "all larger institutions with larger budgets." (Doc. # 32-3 at 42). Tucker agreed, testifying that these were "apples to oranges" comparisons. (Doc. # 32-5 at 41). The University has an enrollment of approximately 4,500 online and on-campus students. (Doc. # 32-1 at 103).

[10] Edmonds also testified that he told Plaintiff that the University was not "giving any raises to anyone," and that "[a]s a matter of fact, [they were not] filling positions" because of budgetary constraints. (Doc. # 32-3 at 29). This was the case notwithstanding the fact that between July 2016 and December 2018, Edmonds received four raises related to changes in his duties or the scope of his position. (Doc. # 32-3 at 50-53). Edmonds testified that Noland issued the first pay raise because Edmonds had taken on many more responsibilities since Snow's retirement. (Doc. # 32-3 at 50). Additionally, one pay raise was due to Edmonds becoming the interim Vice President of Financial Affairs, and the last one was due to him becoming the permanent Vice President. (Doc. # 32-3 at 53).

5

Plaintiff produced show that in 2013 the University's Fiscal Year End Cash Flow (in thousands of dollars) was $26,057,000 and the Operating Cash Flow was $(19,144,000) (Doc. # 40-16 at 26); in 2014, the Fiscal Year End Cash Flow was $21,229,000 and the Operating Cash Flow was $(21,147,000) (Doc. # 40-17 at 26); in 2015, the Fiscal Year End Cash Flow was $19,551,000 and the Operating Cash Flow was $(14,856,000) (Doc. # 40-18 at 24); in 2016, the Fiscal Year End Cash Flow was $15,642,000 and the Operating Cash Flow was $(18,114,000) (Doc. # 40-19 at 24); and in 2017, the Fiscal Year End Cash Flow was $14,757,000 and the Operating Cash Flow was $(19,436,000) (Doc. # 40-20 at 11).[11]

Nevertheless, Edmonds told Plaintiff that, while her pay increase would not amount to Snow's salary, "it would be [] noticeable." (Doc. # 32-1 at 89). Plaintiff testified that she does not recall if at any point during these two discussions she told Edmonds that she believed the pay disparity was because she is a woman. (Doc. # 32-1 at 84). To be sure, when asked if she had any recollection that she told Edmonds on either occasion that she thought the pay disparity between her and Snow was due to her gender, she testified that she did not recall, followed by her statement, "No . . . I did not use those exact words, no, I did not." (Doc. # 32-1 at 93). Moreover, with respect to the pay disparity, Tucker testified that Plaintiff was not compensated at the same rate as Snow due to "the large disparity in experience in that role performing those duties and responsibilities, and concomitant with that would be knowledge, skills, and ability borne of

---

[11] The court notes that, at present, although Defendant asserts there may be some question as to whether these "public financial records" will be admissible (for lack of authentication), they could be reduced to an admissible form at trial. *See Riley v. University of Ala. Health Servs. Found., P.C.*, 990 F. Supp. 2d 1177, 1184 (N.D. Ala. 2014) ("[W]hen deciding a motion for summary judgment, a district court may not consider evidence which could not be reduced to an admissible form at trial.") (quoting *Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999)). And, assuming, without deciding, these financial documents are admissible, they support Defendant's position that it was experiencing substantial financial hardship. While Plaintiff confuses the issues in her Affidavit (*i.e.*, by discussing the "total-debt-to-total-asset ratios, the University's "reserves," and the University's Net Position), based on the relevant information (that is, the year end cash flow and operating cash flow), there is no question that Defendant faced financial hardship between 2013 and 2017.

length of service performing those duties and responsibilities in that role, as well as budgetary constraints." (Doc. # 32-5 at 46).

On April 24, 2018, Plaintiff again met with Edmonds to discuss student deregistration. Plaintiff testified that she also requested a pay increase during this meeting. (Doc. # 32-1 at 109-10). But again, there is no indication that on this occasion she told Edmonds she believed the pay disparity was because of her gender. (Doc. # 32-1 at 97-99). Edmonds is the only person Plaintiff ever spoke to about her salary (Doc. # 32-1 at 100-01, 118), and Plaintiff testified that no aspect of her position changed (and no one began treating her any differently) after her discussions with Edmonds. (Doc. # 32-1 at 111). Rather, consistent with Edmonds assurances, effective October 1, 2018, Plaintiff received an $8,000 pay increase (or 10.67%), raising her annual salary to $83,000. (Doc. # 32-1 at 94; Doc. # 32-3 at 32-33; Doc. # 40-10; Doc. # 47-1 at 1-2, ¶ 3).

On June 1, 2018, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Office ("EEOC"), alleging sex discrimination and retaliation under Title VII of the Civil Rights Act of 1964, as amended, and the Equal Pay Act of 1963, as amended. (Doc. # 20-1; Doc. # 40-22). Plaintiff filed her initial Complaint in this case on June 12, 2018 (Doc. # 1), and on June 14, 2018, she filed an amended EEOC Charge (Doc. # 20-2). On October 9, 2018, Plaintiff received her Right to Sue letter. (Doc. # 20-3).

## II.    Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court

of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and -- by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file -- designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("*Anderson*"). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c) a plaintiff may not simply rest on her allegations made in the complaint; instead, as the party bearing the burden of proof at trial, she must come forward with at least some evidence to support each element essential to her case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

The Eleventh Circuit has interpreted *Celotex* to require that, as to issues on which the movant would bear the burden of proof at trial, a

> party must show *affirmatively* the absence of a genuine issue of material fact: it must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial. In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party. If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the non-moving party, in response, come[s] forward with significant, probative evidence demonstrating the existence of a triable issue of fact.

*Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (quoting *U.S. v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

III.     **Discussion**

Plaintiff's First Amended Complaint advances four causes of action: (1) Gender Discrimination in violation of the Equal Pay Act ("EPA"); (2) Retaliation in violation of the EPA; (3) Disparate Treatment – Gender Discrimination in violation of Title VII; and (4) Retaliation in violation of Title VII. (Doc. # 20). The court first addresses Plaintiff's EPA claim asserted in Count One. It then analyzes her Title VII pay discrimination claim advanced in Count Three. Finally, it concludes by assessing her retaliation claims asserted in Counts Two and Four. After careful review, the court concludes that Defendant's Motion for Summary Judgment (Doc. # 30) is due to be granted.

A.     **Plaintiff's Pay Discrimination Claims**

Before the court analyzes each cause of action, however, it is helpful to review the differences between the EPA and Title VII pay discrimination claims, as they involve different burdens of proof.

> The Equal Pay Act was directed only at wage discrimination between the sexes and forbids the specific practice of paying unequal wages for equal work to employees of the opposite sex. Title VII, on the other hand, forbids discrimination on the basis of gender, race, or national origin in a wide range of employment practices, including hiring, firing, training, and promoting. . . .
>
>      . . .
>
> . . . A plaintiff suing under the Equal Pay Act must meet the fairly strict standard of proving that she performed substantially similar work for less pay. The burden then falls to the employer to establish one of the four affirmative defenses provided in the statute. Under the disparate treatment approach of Title VII, however, there is a relaxed standard of similarity between male and female-occupied jobs, but a plaintiff has the burden of proving an intent to discriminate on the basis of sex (or race or national origin). . . .
>
>      . . .
>
> [Overall,] Title VII and the Equal Pay Act exist side by side in the effort to rid the workforce of gender-based discrimination. Plaintiffs have two tools for relief,

each of which provides different burdens of proof and may produce different amounts of compensation. If a defendant has both violated the Equal Pay Act and denied a woman a promotion because of her sex, the plaintiff may sue for relief under both statutes and is entitled to recovery for both injuries, if she satisfies the requirements of both laws.

In *Alexander v. Gardner–Denver Co.*, 415 U.S. 36 (1974), the Supreme Court held that Title VII was intended to "supplement, rather than supplant, existing laws and institutions relating to employment discrimination" and that "the legislative history of Title VII manifests a congressional intent to allow an individual to pursue independently his rights under both Title VII and other applicable federal statutes."

*Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1526-27 (11th Cir. 1992) (internal footnotes and citations omitted) (citing *Waters v. Turner*, 874 F.2d 797, 801 n.10 (11th Cir. 1989)). With this backdrop, the court begins its analysis by examining Plaintiff's EPA claim and then addressing her related pay claim under Title VII.

### 1.       Plaintiff's Claim of Gender Discrimination in Violation of the EPA

In Count One of Plaintiff's First Amended Complaint, she contends that Defendant discriminated against her because of her gender "by compensating her in a manner less than that of male employees for substantially similar duties, the performance of which required similar skill, effort, and responsibility, and which are performed under similar working conditions." (Doc. # 20 at 5, ¶ 23). Defendant asserts that Plaintiff's *prima facie* case fails because she cannot present substantial evidence that she and Snow (the only alleged comparator) performed equal work requiring equal skill, effort, and responsibility. (Doc. # 31 at 11).

The EPA, which is a part of the Fair Labor Standards Act, is "directed only at wage discrimination between the sexes and forbids the specific practice of paying unequal wages for equal work to employees of the opposite sex." *Miranda*, 975 F.2d at 1526; *see* 29 U.S.C. § 206(d)(1). To establish a *prima facie* case under the EPA, a plaintiff "must show that an employer pays different wages to employees of opposite sexes 'for equal work on jobs[,] the

11

performance of which requires equal skill, effort, and responsibility[] and which are performed under similar working conditions.'" *Miranda*, 975 F.2d at 1532 (quoting *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974)). "A plaintiff establishes a *prima facie* case by comparing the job[] held by the female and male employee[], and by showing that those jobs are substantially equal, not by comparing the skills and qualifications of the individual employees holding those jobs." *Id.* at 1533 (citation omitted). If a plaintiff can make out a *prima facie* case,

> the burden shifts to the employer to prove [by a preponderance of the evidence] that the difference in pay is justified by one of . . . four exceptions . . . : "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex."

*Id.*; *see Steger v. General Elec. Co.*, 318 F.3d 1066, 1078 (11th Cir. 2003). Put another way, "[o]nce the disparity in pay between substantially similar jobs is demonstrated, the burden shifts to the defendant to prove that a 'factor other than sex' is responsible for the differential." *Miranda*, 975 F.2d at 1533 (citing *Mitchell v. Jefferson Cty. Bd. of Educ.*, 936 F.2d 539 (11th Cir. 1991)). "The burden to prove these affirmative defenses is heavy and must demonstrate that 'the factor of sex provided *no basis* for the wage differential.'" *Steger*, 318 F.3d at 1078 (quoting *Irby v. Bittick*, 44 F.3d 949, 954 (11th Cir. 1995)) (emphasis in original). And, "[a]lthough an employer may not rely on a '*general practice*' as a factor 'other than sex,' it may consider factors such as the 'unique characteristics of the same job; . . . an individual's *experience*, training[,] or ability; or . . . special exigent circumstances connected with the business.'" *Id.* (quoting *Irby*, 44 F.3d at 955) (emphasis in original) (internal citation omitted). "Once the employer's burden is met, the employee 'must rebut the explanation by showing with affirmative evidence that it is pretextual or offered as a post-event justification for a gender-based differential.'" *Id.* (citing *Irby*, 44 F.3d at 954).

### a.   Plaintiff Has Presented a *Prima Facie* Case Under the EPA

The court concludes that Plaintiff has presented a *prima facie* case under the EPA. The only comparator Plaintiff has proffered is her predecessor, Snow. Defendant argues that Plaintiff did not operate under "similar working conditions" because Plaintiff had the assistance of VanLuvender, and her predecessor, Snow, did not. However, the Rule 56 evidence suggests otherwise. Plaintiff testified that VanLuvender merely assisted (as opposed to "trained") her with preparing the financial statements during 2014, and that she now only assists "as needed." (Doc. # 32-1 at 29). The court concludes that recruiting another employee for short-term assistance does not negate the fact that Plaintiff, while working as Comptroller, performed substantially the same duties as Snow did while he was employed as Comptroller. Additionally, it is undisputed that Plaintiff assisted Snow with many of his duties while he was battling his illness.

Under the EPA, "the controlling factor . . . is job content—the actual duties that the respective employees are called upon to perform." *Miranda*, 975 F.2d at 1533 (citation omitted). The Rule 56 record demonstrates that Plaintiff was performing most of the duties and responsibilities of Comptroller before she formally filled that position, and she continued to perform those duties and responsibilities, with the addition of even more, once she formally became Comptroller. Edmonds even testified that "the duties and responsibilities of [C]omptroller [were] pretty much the same for [Plaintiff] as they were for [] Snow." (Doc. # 32-3 at 34). As such, it is readily apparent that Plaintiff's position as Comptroller is sufficiently similar to Snow's position as Comptroller. Therefore, the court concludes that she has established a *prima facie* case of gender discrimination under the EPA.

### b.   Defendant Has Articulated Legitimate, Non-Discriminatory Reasons for Plaintiff's Lower Pay, and Plaintiff Has Failed to Show that Defendant's Reasons are Pretext for Pay Discrimination Under the EPA

Because Plaintiff has established a *prima facie* case, the burden shifts to Defendant to establish that the difference in pay is justified by: (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) a differential based on any other factor other than sex. *Miranda*, 975 F.2d at 1533. This burden is "a heavy one," because "the exceptions granted within the EPA constitute affirmative defenses." *Mulhall v. Advance Sec., Inc.*, 19 F.3d 586, 590 (11th Cir. 1994) (citing *Corning Glass Works*, 417 U.S. at 196-97); *see Butler v. Albany Int'l*, 273 F. Supp. 2d 1278, 1290 (M.D. Ala. 2003) (citation omitted). Defendant contends that Plaintiff was paid less than Snow due to his 27 years of experience as Comptroller as compared to her four years of experience in that position. (Doc. # 31 at 12). Specifically, Tucker testified that Plaintiff was not compensated at the same rate as Snow due to "the large disparity in experience in that role performing those duties and responsibilities, and concomitant with that would be knowledge, skills, and ability borne of length of service performing those duties and responsibilities in that role, as well as budgetary constraints." (Doc. # 32-5 at 46).

Under Eleventh Circuit case law, "[e]xperience is an acceptable factor other than sex if not used as a pretext for differentiation because of gender." *Irby*, 44 F.3d at 956 (citation omitted). Here, Defendant repeatedly stated that Plaintiff was not paid the same salary as Snow because of his 27-year tenure, as well as the fact that the University was going through a severe budgetary crisis. Plaintiff compares her salary as a fairly new Comptroller (on the job less than five years) to Snow's pay at the point when he had held the position for nearly three decades. That is apples and oranges, even though they had the same job at different points in time. And, even if that were not enough to distinguish the two (and, it is), she requested substantial pay increases when the University was hemorrhaging money. Considering the entirety of the Rule 56

record, and viewing it in the light most favorable to Plaintiff, neither of those reasons indicate that gender was a motivating factor in Defendant's decision regarding Plaintiff's salary.

Moreover, Plaintiff has failed to rebut Defendant's reasons. Not only is the Rule 56 record devoid of even a hint of gender animus in determining Plaintiff's salary, but she has failed show that she had "equal or more experience of the same type" as Snow. *Blackman v. Florida Dep't of Bus. & Prof'l Regulation*, 599 F. App'x 907, 912 (11th Cir. 2015) (quoting *Irby*, 44 F.3d at 956). She has also failed to suggest, let alone show, that Defendant's reasons were merely offered as a post-event justification for a gender-based differential.

Consequently, Plaintiff has failed to establish the existence of a genuine issue of material fact requiring resolution by a jury. *Ponamgi v. Safeguard Servs., LLC*, 558 F. App'x 878, 880 (11th Cir. 2014) (citation omitted). Therefore, Defendant's Motion for Summary Judgment (Doc. # 30) is due to be granted as to Count One.

### 2. Plaintiff's Claim of Disparate Treatment Gender Discrimination (as to Compensation) in Violation of Title VII

In Count Three of Plaintiff's Amended Complaint, she alleges that Defendant "discriminated against [her] on the basis of gender by compensating her in a manner less than that of male employees for substantially similar duties." (Doc. # 20 at 7, ¶ 30). While Plaintiff uses the phrase "male employees" (plural), it is clear from her deposition testimony that the only comparator here is her predecessor, Snow. (Doc. # 32-1 at 154-55).

"Under Title VII, it is unlawful for an employer to discriminate against an employee on the basis of [her] gender with respect to the terms and conditions of [her] employment, including compensation." *Mahone*, 2018 WL 1526336, at *7 (citing 42 U.S.C. § 2000e-2(a)); *Gooden v. Internal Revenue Serv.*, 679 F. App'x 958, 964 (11th Cir. 2017). The Eleventh Circuit has held

that "the *McDonnell Douglas/Burdine*[12] approach to disparate treatment is the appropriate framework for evaluating [a plaintiff's] claim of gender-based wage discrimination," *Miranda*, 975 F.2d at 1528 (citation omitted), but "the burden of showing the similarity of work performed by a female plaintiff and a male comparator is 'more relaxed' under Title VII than under the EPA." *Woodard v. Medseek, Inc.*, 178 F. Supp. 3d 1188, 1199 (N.D. Ala. 2016) (quotation omitted).

Where there is no direct evidence of discrimination (and, to be sure, that is the case here), the *McDonnell Douglas* framework is applied. *Miranda*, 975 F.2d at 1528 (citation omitted). In order to establish a *prima facie* case, "a plaintiff must establish that (1) she belongs to a [gender] minority; (2) she received low wages; (3) similarly situated comparators outside the protected class received higher compensation; and (4) she was qualified to receive the higher wage." *Cooper v. Southern Co.*, 390 F.3d 695, 735 (11th Cir. 2004), *overruled on other grounds by Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006) (citing *Miranda*, 975 F.2d at 1528 (dealing with a pay discrimination claim based on gender) and *MacPherson v. University of Montevallo*, 922 F.2d 766, 774 (11th Cir. 1991) (dealing with a pay discrimination claim based on age)); *see Reddy v. Alabama Dep't of Educ.*, 808 F. App'x 803, 811 (11th Cir. Apr. 2, 2020) ("To [establish a Title VII disparate pay claim], the plaintiff must show that she was a qualified member of a protected class and subjected to an adverse employment action in contrast to [a] similarly situated employee[] outside [her] protected class.") (citing *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010)). The third factor in the Title VII *prima facie* test (*i.e.*, a similarly situated comparator) is interpreted "less stringently. In this context, a plaintiff satisfies [her] *prima facie* burden of comparability simply by showing that [s]he

---

[12] *See McDonnell Douglas v. Green*, 411 U.S. 792 (1973); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981).

16

'occupies a job similar to that of higher paid' persons outside the protected class." *Sharpe v. Global Sec. Int'l*, 766 F. Supp. 2d 1272, 1294-95 (S.D. Ala. 2011) (quoting *Meeks v. Computer Assoc. Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994)); *see Ledbetter v. Goodyear Tire & Rubber Co.*, 421 F.3d 1169, 1185 (11th Cir. 2005) (quoting *Meeks*, 15 F.3d at 1019). So, as one court has put it, while "[t]he Equal Pay Act requires a plaintiff to meet a 'fairly strict' burden of proving she did 'substantially similar' work for less pay. . . . Title VII requires a plaintiff to show a more 'relaxed standard of similarity' between the jobs." *Rollins v. Alabama Community College Sys.*, 814 F. Supp. 2d 1250, 1267 (M.D. Ala. 2011) (citations omitted).

Particularly before last year, Eleventh Circuit caselaw was less than clear as to what comparator standard should be applied in pay discrimination claims. Previously, one panel (in an unpublished decision) suggested that the "strict" comparator standard be used in the context of pay discrimination claims. *See Hill v. Emory Univ.*, 346 F. App'x 390 (11th Cir. 2009), *cert. denied,* 559 U.S. 991 (2010). This "strict" standard refers to the prior test that a comparator must be "similarly situated in all relevant respects." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004), *abrogated by Lewis v. City of Union City, Ga.*, 918 F.3d 1213 (11th Cir. 2019). But, this so-called "strict" test was altered by *Lewis*. Now, the rule is that a proffered comparator must be "similarly situated in all *material* respects." *Lewis*, 918 F.3d at 1218 (emphasis added). Another court in this Circuit recently dealt with a pay claim post-*Lewis*. *See Vinson v. Macon-Bibb Cty.*, 2020 WL 2331242, at *4 (M.D. Ga. May 11, 2020). The *Vinson* court cited *Lewis* in analyzing the third factor of the *prima facie* case, evaluating whether the plaintiff "present[ed] a comparator who *received higher compensation.*" *Vinson*, 2020 WL 2331242, at *4 (emphasis in original) (quoting *Walker*, 624 F. App'x at 686). Although the *Vinson* court did not delve into the similarities that are generally necessary to establish a

comparator under *Lewis*, it did adhere to *Lewis*'s instruction that a plaintiff and a proffered comparator must be "sufficiently similar . . . that they 'cannot reasonably be distinguished.'" *Lewis*, 918 F.3d at 1228 (citation omitted).

The court cannot conceive of any principled reason why *Lewis* does not apply to a pay discrimination claim. If the plaintiff and her comparator are not sufficiently similar, the singular fact that they are paid at different rates does not raise any inference of discrimination. Therefore, caselaw suggests that even applying *Lewis* -- which appears to be the proper course of action here -- the key question is whether a plaintiff has shown a sufficiently similar comparator who received higher compensation such that the circumstances give rise to an inference of unlawful discrimination.

If the plaintiff makes such a showing, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802; *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc). "This burden is 'exceedingly light'; the defendant must merely proffer non-gender based reasons, not prove them." *Meeks*, 15 F.3d at 1019. If the employer satisfies that burden, the presumption of discrimination is rebutted, and the plaintiff must offer evidence from which a reasonable jury could find that the employer's supposedly legitimate reason is merely a pretext for unlawful discrimination. *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1061 (11th Cir. 1994); *Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1141-42 (11th Cir. 1983). If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it "head on and rebut it." *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc).

> **a.**   **Plaintiff Has Failed to Establish a *Prima Facie* Case of Disparate Treatment Gender Discrimination**

Here, it is undisputed that Snow, a male, received higher wages than Plaintiff, a female.

But, Defendant asserts that Snow is not an appropriate comparator. Under *Lewis*, a proffered comparator must be "similarly situated in all material respects." 918 F.3d at 1218. As stated above, under this standard, "a plaintiff is required 'to present a comparator who received higher compensation.'" *Vinson*, 2020 WL 2331242, at *4 (emphasis omitted) (citation omitted). However, adhering to *Lewis*, a plaintiff and a proffered comparator "must be sufficiently similar, in an objective sense, that they 'cannot reasonably be distinguished.'" *Lewis*, 918 F.3d at 1228 (citation omitted). Indeed, the intent behind the *McDonnell Douglas prima facie* case is to "'eliminate[] the most common nondiscriminatory reasons' for the employer's treatment of the plaintiff—and in so doing '*give[] rise to an inference of unlawful discrimination*.'" *Lewis*, 918 F.3d at 1222 (emphasis added) (quoting *Burdine*, 450 U.S. at 253-54) (citations omitted).

Here, the court concludes that Plaintiff has failed to establish a valid comparator, and, as such, has failed to establish a *prima facie* case. That is, she has failed to raise an inference of unlawful discrimination. Although Plaintiff occupies the Comptroller position and makes approximately $16,822.00 less than her predecessor, Snow held the Comptroller position for 27 years. (Doc. # 40-22 at 3). Plaintiff has only formally held the position for less than five years. It is clear that the similarities between Plaintiff and Snow end at their job title.

In *Lewis*, the Eleventh Circuit emphasized that the "similarly situated in all material respects" standard "serves the interest of sound judicial administration by allowing for summary judgment in *appropriate* cases—namely, where the comparators are simply too dissimilar to permit a valid inference that invidious discrimination is afoot." *Lewis*, 918 F.3d at 1228-29 (emphasis in original) (footnote omitted). This is one of those cases where the comparator (here, Snow) is too dissimilar to permit an inference of discrimination.[13]

---

[13] The court has concluded that Plaintiff established a *prima facie* case under the EPA, yet failed to establish a *prima facie* case of pay discrimination under Title VII. While this may seem counterintuitive in light of

> **b.** **Defendant Has Proffered Legitimate, Non-Discriminatory Reasons for the Pay Disparity, and Plaintiff Has Failed to Show that Those Proffered Reasons are Pretext for Unlawful Discrimination**

The court has concluded that for purposes of Title VII, Plaintiff has not established a *prima facie* case of pay discrimination because Snow is not a valid comparator. But, even if she had been able to successfully do so, it is equally clear that Defendant has articulated legitimate, non-discriminatory reasons for not paying Plaintiff the same salary as Snow. So, the burden would shift back to Plaintiff to show those reasons are a pretext for gender discrimination. In the interest of a complete analysis, the court addresses the pretext question.

Both Tucker and Edmonds testified that Plaintiff's salary is not equal to Snow's salary because (1) Snow had 27 years of experience in the Comptroller position, as opposed to Plaintiff's roughly four years (currently), and (2) the University was experiencing great financial hardship that limited its ability to give raises to Plaintiff and others. These are legitimate, non-discriminatory reasons for the disparity between Plaintiff's salary and that of Snow. *See Barber v. Int'l Bhd. of Boilermakers*, 778 F.2d 750, 760-61 (11th Cir. 1985) (concluding that an employee's allegedly greater experience was a legitimate, non-discriminatory reason for his increased wages and sufficient to rebut the plaintiff's *prima facie* case). Further, "Title VII does not allow federal courts to second-guess nondiscriminatory business judgments, nor does it replace employers' notions about fair dealing in the workplace with that of judges. [The court is] not a 'super-personnel department' assessing the prudence of routine employment decisions, 'no matter how medieval,' 'high-handed,' or 'mistaken.'" *Flowers v. Troup Cty, Ga., Sch. Dist.*, 803

---

Eleventh Circuit precedent suggesting that the *prima facie* standard in a Title VII pay discrimination case is laxer than the EPA standard, this is the right result here. The EPA *prima facie* standard -- though stricter than Title VII in a general sense -- focuses on the similarities between job duties. Here, Plaintiff and Snow held the same position and performed substantially similar duties, but Plaintiff is paid less. Thus, it is readily apparent that Plaintiff can satisfy the EPA *prima facie* standard. However, under the Title VII *prima facie* standard, *Lewis* mandates that a plaintiff proffer a comparator who is similarly situated in all material respects, an inquiry that the court does not address in the EPA setting until it assesses the employer's defense.

F.3d 1327, 1338 (11th Cir. 2015) (quoting *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010)). Because Defendant has articulated legitimate, non-discriminatory reasons for the disparity between Plaintiff's salary and Snow's, the burden shifts back to Plaintiff to show that Defendant's proffered reasons are a pretext for unlawful discrimination. *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1326 (11th Cir. 2011).

In her opposition brief, Plaintiff contends that Tucker and Edmonds arbitrarily calculated Plaintiff's salary, which is evidence of pretext. This argument holds no water. Again, Title VII precludes courts from second-guessing non-discriminatory business judgments. Here, the Rule 56 record reflects that the reasons that Plaintiff's salary was less than Snow's are non-discriminatory and an exercise of business judgment. With respect to her salary when she was switched from an hourly employee to a salaried employee, Edmonds testified that he came up with the $75,000.00 figure by going "back and look[ing] at what she had made the year before [including] working overtime," which was around $71,000. (Doc. # 32-3 at 27). Edmonds testified that he "gave [Plaintiff] a boost to cover what [he] thought [Plaintiff] could possibly . . . make more than she would in overtime." (*Id.*). There is no Rule 56 evidence showing that gender was considered in this calculation.

Plaintiff also complains about her receipt of an $8,000 raise. She notes that Tucker testified that he does not recall how he and Edmonds determined this number or the factors on which they based that decision. (Doc. # 32-5 at 32). And, she points out that Tucker also testified that he did not undertake an effort to ascertain what salary Plaintiff should receive, and he did not request Edmonds to do so either. (Doc. # 32-5 at 31). Nonetheless, Plaintiff has failed to show how this lack of analysis or evaluation on Defendant's part supports an inference that her *gender* was considered in this calculation. It may not be good HR or compensation policy; but, it

is not indicative of gender discrimination.

Plaintiff next contends that Defendant's reasons for the pay disparity between herself and Snow are pretextual because Edmonds received four raises in an 18-month period and Tucker received at least two raises between 2015 and 2016, all while Defendant was experiencing financial hardship. However, Plaintiff's argument misses the mark. Edmonds's salary, as her supervisor, is not comparable (or relevant) to Plaintiff's salary, and Tucker's salary, as President, is set by the Board of Trustees, which is clearly in no way comparable to Plaintiff's salary. (Doc. # 32-5 at 39). Plaintiff has also failed to assert where the funds for Edmonds's and/or Tucker's salaries are drawn from, and whether those funds affect the amount of pay raises that could be awarded to Plaintiff—or any other University employee for that matter. Additionally, Plaintiff contends that budgetary constraints did not impede the University from awarding male employees bonuses and raises during the time Plaintiff requested the same. However, she testified that Allison Brantley, a *female* employee of Defendant, received a $4,000.00 raise, and Tina Jones, a *female*, was awarded a promotion that carried with it a $33,856.00 raise, sometime after June 2018—*i.e.*, the relevant timeframe. (Doc. # 40-23 at 4-5, ¶ 11). This, quite plainly, cuts against her gender discrimination arguments related to budgetary restraints. And finally, Plaintiff's argument also ignores the fact that she received five raises after being placed in the Comptroller position.

Although Plaintiff may be unhappy with the overall amount of her salary, this, by itself, does not show that Defendant's proffered reasons are a pretext for gender discrimination. Moreover, the financial information contained in Plaintiff's Affidavit confirms Defendant was in a cash crunch during the relevant time period. (Doc. # 40-23 at 5, ¶ 12). As such, Plaintiff has failed to show "such weaknesses, implausibilities, inconsistencies, incoherencies, or

contradictions" in Defendant's proffered legitimate reasons, and the court concludes that a reasonable factfinder could not find those reasons unworthy of credence. *Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1252, 1265 (11th Cir. 2010) (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)).

### c.    Plaintiff Has Failed to Present Other Circumstantial Evidence of Disparate Treatment Gender Discrimination

Although it is often useful, the *McDonnell Douglas* framework "is not the exclusive means" of prevailing on a Title VII claim based on circumstantial evidence. *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 768 n.3 (11th Cir. 2005). A plaintiff's claim will also survive summary judgment if she otherwise presents "enough circumstantial evidence to raise a reasonable inference of intentional discrimination." *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1320 (11th Cir. 2012). This alternative has been referred to as the "mosaic theory." *See Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).

At the outset, the court notes that Plaintiff's First Amended Complaint centers on the fact that, although she did, in fact, receive multiple pay raises, they simply were not enough. This "unhappiness," by itself, does not indicate that gender was a motivating factor in not raising her salary to what she would have preferred it to be. Moreover, Defendant reiterated the severity of the University's financial situation on numerous occasions. Tucker inherited a poor financial situation when he became President of the University, and this is evidenced by the fact that, prior to Edmonds taking over as Vice President for Financial Affairs and Tucker taking over as President, the University's "reserves had been depleted" (Doc. # 32-5 at 23), and the University gave out Christmas bonuses for about four or five years "until [they] discovered [they] did not have the money out there." (Doc. # 32-3 at 56-57). Additionally, every year that Tucker has been President, the University's financial situation has been "in the red"—that is, their revenues did

not exceed their expenses. (Doc. # 32-5 at 49). Moreover, both Tucker and Edmonds testified that during the time Plaintiff requested a pay raise, no one was receiving raises. Although Plaintiff argues that Edmonds and Tucker (the Vice President of Financial Affairs and the President, respectively) received raises that does not suggest gender discrimination—again, during that same period, she and two other women (one of them a Board member) also received raises.

Additionally, Defendant reiterated that Plaintiff was not paid Snow's salary ($99,822.00) because, at the time she complained of the pay disparity to Edmonds, she had only been formally employed as Comptroller for approximately three years, and Snow had served as Comptroller for 27 years. Even though Plaintiff was performing some of Snow's duties while employed as the Accounting Supervisor, it is within Defendant's discretion to set Plaintiff's salary, and Plaintiff has failed to show where in Defendant's calculations it considered her gender.

Viewing all the Rule 56 evidence in the light most favorable to Plaintiff, and for the reasons indicated above, the court concludes that there is insufficient "other circumstantial evidence" from which a reasonable jury could conclude that Defendant discriminated against Plaintiff by paying her less than Snow *because* she is a woman. Courts are prohibited from second-guessing a defendant's business judgment where there is no indication of a discriminatory motivation. *See Pennington*, 261 F.3d at 1267 *(*"[F]ederal courts do not sit to second-guess the business judgment of employers.") (quoting *Combs*, 106 F.3d at 1543). That is the case here. Plaintiff has fallen far short of presenting sufficient circumstantial evidence of gender bias to require a jury to resolve her gender discrimination claim before a jury.

### B.      Plaintiff's Retaliation Claims Under the EPA and Title VII

In Count Two of Plaintiff's First Amended Complaint, she alleges that Defendant

retaliated against her by failing to pay her the amount due for the Comptroller position. (Doc. # 20 at 6, ¶ 26). The court notes that the Eleventh Circuit has yet to set out the test for courts to use in adjudicating a motion for summary judgment on an EPA retaliation claim. *See Mahone v. BBG Specialty Foods, Inc.*, 2018 WL 1526336, at *14 (M.D. Ala. Mar. 28, 2018). However, two district courts in this circuit have concluded that, in order to establish an EPA retaliation claim, a plaintiff must show the same elements that are required to make out a *prima facie* case for Title VII retaliation.[14] *See id.* at *14; *Saridakis v. South Broward Hosp. Dist.*, 681 F. Supp. 2d 1338, 1353 (S.D. Fla. 2009) (citing *Culver v. Gorman & Co.*, 416 F.3d 540, 545 (7th Cir. 2005)). The court finds these cases persuasive and agrees with their analysis. Accordingly, the court analyzes Plaintiff's EPA and Title VII retaliation claims together, using the Title VII retaliation framework.

Title VII makes it unlawful for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment practice . . . or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding . . . ." 42 U.S.C. § 2000e–3(a). The first subsection is referred to as Title VII's opposition clause. "The opposition clause by its very nature focuses upon the motive of the

---

[14] This is the case notwithstanding the fact that the EPA is a part of the Fair Labor Standards Act. But, "the elements and the burden-shifting paradigm for a claim of retaliation under the FLSA and Title VII are substantively identical." *Mahone*, 2018 WL 1526336, at *14. As the Eleventh Circuit has noted:

> The FLSA protects persons against retaliation for asserting their rights under the statute. *See* 29 U.S.C. § 215(a)(3). A prima facie case of FLSA retaliation requires a demonstration by the plaintiff of the following: "(1) she engaged in activity protected under [the] act; (2) she subsequently suffered adverse action by the employer; and (3) a causal connection existed between the employee's activity and the adverse action." *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 208-09 (10th Cir. 1997). If the employer asserts a legitimate reason for the adverse action, the plaintiff may attempt to show pretext. *See id.* In demonstrating causation, the plaintiff must prove that the adverse action would not have been taken "but for" the assertion of FLSA rights. *See Reich v. Davis*, 50 F.3d 962, 965-66 (11th Cir. 1995).

*Wolf v. Coca-Cola Co.*, 200 F.3d 1337, 1342-43 (11th Cir. 2000).

employee, covering only one who 'has opposed' any practice which violates Title VII." *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1187 (11th Cir. 1997). The second subsection is referred to as the participation clause. "The Participation Clause 'protects proceedings and activities which occur in conjunction with or after the filing of a formal charge with the EEOC; it does not include participating in an employer's internal, in-house investigation, conducted apart from a formal charge with the EEOC.'" *Anduze v. Florida Atlantic Univ.*, 151 F. App'x 875, 877 (11th Cir. 2005) (quoting *E.E.O.C. v. Total System Services, Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000)).

Claims of retaliation under Title VII follow the *McDonnell Douglas* burden-shifting framework. *Jackson v. Geo Group, Inc.*, 312 F. App'x 229, 233 (11th Cir.2009); *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1162-63 (11th Cir. 1993). Thus, to establish a *prima facie* case of retaliation under Title VII (and, here, the EPA), a plaintiff must show that (1) she engaged in protected activity; (2) she suffered an adverse employment action by the employer simultaneously with or subsequent to such opposition or participation; and (3) a causal connection exists between the protected activity and the adverse employment action. *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008). "If a plaintiff establishes a *prima facie* case of retaliation and the employer proffers a legitimate, non-discriminatory reason for the adverse employment action, the plaintiff must then demonstrate that the employer's proffered explanation is a pretext for retaliation." *Watson v. Kelley Fleet Servs., LLC*, 430 F. App'x 790, 791 (11th Cir. 2011) (citing *Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997)).

Plaintiff asserts that Defendant retaliated against her by (1) failing to increase her salary to that of Snow's as Comptroller, and (2) lowering the "market value" of her position. Plaintiff contends Defendant took these allegedly retaliatory actions after she discussed with Edmonds the

disparity between her salary and that of Snow's in 2017 and 2018, and after she filed her June 14, 2018 amended EEOC Complaint. The court addresses both activities. After doing so, it concludes that Plaintiff has failed to establish a *prima facie* case of retaliation with respect to each claim.

### 1.    Plaintiff's Protected Conduct

An employee who opposes discrimination is shielded from retaliation, so long as that opposition is based on both a subjective (good faith) belief and an objective (reasonable) belief that the employment practice violated Title VII. *Bryant v. United States Steel Corp.*, 428 F. App'x 895, 897-98 (11th Cir. 2011). Here, Plaintiff first asserts that Defendant retaliated against her after she spoke with Edmonds in 2017 and 2018 about her compensation by "[n]ot . . . [paying her] as much as [her] predecessor and [being] asked to take on additional responsibilities." (Doc. # 32-1 at 113). Specifically, the Rule 56 record indicates that Plaintiff first spoke with Edmonds in the Spring of 2017 and requested an increase to her salary, noting the disparity between her salary and that of her predecessor, Snow. (Doc. # 32-1 at 81-84, 86). Later, on March 20, 2018, Plaintiff again spoke with Edmonds about her salary. During this second meeting, Edmonds told Plaintiff she would receive a pay increase at the beginning of the next fiscal year (as opposed to at that time) due to budgetary constraints. Plaintiff spoke with Edmonds once again on April 24, 2019. In October 2018, she received an $8,000 pay increase, but she was still making less than Snow did when he left the Comptroller position. (Doc. # 32-1 at 94; Doc. # 32-3 at 32-33). In her deposition testimony, Plaintiff testified that she "does not recall" whether she told Edmonds that she believed the pay disparity was because she is a woman, but that she does not believe she "use[d] those exact words." (Doc. # 32-1 at 84, 93). Viewing the Rule 56 record in the light most favorable to Plaintiff, the court has substantial

doubts that Plaintiff's discussions with Edmonds qualify as protected opposition. Indeed, they do not appear to. Nevertheless, the court will analyze the other two elements of the test for clarity and completeness.

Plaintiff also contends that she engaged in protected conduct when she filed her EEOC Charge on June 1, 2018 (and her amended Charge on June 14, 2018). Unlike her purported "opposition," it is undisputed that the filing of her EEOC Charge is clearly protected activity. *See Gray*, 756 F. Supp. 2d at 1349. As such, Plaintiff has sufficiently established that she engaged in protected conduct, and the court analyzes the other two elements of the test as to this claim, too.

### 2.     Adverse Employment Action

Plaintiff must now show that she suffered an actionable adverse employment action. The standard for what constitutes an adverse employment action in the retaliation context differs from the standard applied in the discrimination context in that it is much laxer. *See Mills v. Cellco P'ship*, 376 F. Supp. 3d 1228, 1244 (N.D. Ala. 2019) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). "In order to constitute an adverse employment action for purposes of establishing a *prima facie* case [of retaliation], the action must be materially adverse from the standpoint of a reasonable employee, such that it would dissuade a reasonable employee from making a discrimination charge." *Williams v. Apalachee Ctr., Inc.*, 315 F. App'x 798, 799 (11th Cir. 2009) (citing *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 57, 68). "Such a determination is inherently fact-specific and 'depend[s] upon the particular circumstances' of the case." *Allen*, 963 F. Supp. 2d at 1251 (citations and quotation omitted).

Here, the Rule 56 record simply does not support the conclusion that Plaintiff suffered an adverse employment action. Plaintiff testified that her retaliation claim rests exclusively on "[n]ot being paid as much as my predecessor and [being] asked to take on additional

responsibilities." (Doc. # 32-1 at 113). "[C]ontinuing to be paid less than . . . Snow" is not an actionable adverse employment action. Moreover, after she spoke with Edmonds about her salary, she received an $8,000.00 raise. In fact, Plaintiff has received approximately five raises, to date, while employed as Comptroller (Doc. # 32-1 at 68)—all while the University was experiencing great financial hardship (as evidenced by the public records Plaintiff produced). While these raises may not have brought her salary to that of Snow's at the time of his retirement, by definition, a pay raise is not an adverse employment action.

Next, the undisputed Rule 56 evidence demonstrates that any "additional" responsibilities Plaintiff assumed occurred *before* she complained to Edmonds about the pay disparity or filed her EEOC Complaint.

Further, Plaintiff contends in her opposition brief that "[s]ince filing her EEOC complaint, the 'market value' of the position of Comptroller has been significantly lowered by the actions of Defendant." (Doc. # 36 at 28; Doc. # 40-23 at 7, ¶ 17). However, other than the conclusory statements she has made in her Affidavit (which do not indicate when the "market value" was lowered), Plaintiff has offered no Rule 56 evidence indicating what the market value of the Comptroller position is, how it is calculated, how it has fluctuated, or any other pertinent information that would assist the court in understanding her argument. So, although Plaintiff testified in her Affidavit that "[t]he market value is now below [her] current salary . . . so [she] ha[s] no way of receiving an equity raise," and she is "only eligible to receive future increases that are given to all employees across-the-board," there is nothing in the Rule 56 record supporting this assertion. And, Edmonds's undisputed testimony refutes the conclusion. Edmonds testified as follows:

> Several people have [received pay raises] through the longevity program we have.
> . . . What we have is we have a faculty senate or staff senate that did a study years

ago, and it came up with people's market values. And every year we take a formula, and based on what people's market values are – they're all small, small raises. We take the top dollar amount that we have that we've allotted to give to the equity raises, which is usually, say, in the terms of 75, 80,000 dollars. We divvy it up. It may be among 50 people or more than that. And we bump up their - to try to get them up to their market value. Every five years, we adjust market values.

(Doc. # 32-3 at 34). Overall, there is simply no Rule 56 evidence supporting Plaintiff's "market value" argument.

Finally, Plaintiff admitted in her testimony that the University did not and has not taken any negative action against her as a result of her discussions with Edmonds. (Doc. # 32-1 at 113, 128). In order to assert an actionable adverse employment action; there must be an *adverse* action. Plaintiff has failed to show any action that could even conceivably be deemed adverse. And, while Plaintiff testified in her Affidavit that there was an incident involving herself and Edmonds where he raised his voice on one occasion, under black-letter Eleventh Circuit case law, such an "incident" does not establish an actionable adverse employment action. To be sure, Plaintiff testified that Edmonds "came to [her] office, and while standing at [her] office door, he raised his voice to [her]" and then stormed off. (Doc. # 40-23 at 7, ¶ 18). It is understood that "Title VII's anti-retaliation provision does not protect employees from superiors' occasional constructive—and even negative—feedback." *Mills v. Cellco P'ship*, 376 F. Supp. 3d 1228, 1246 (N.D. Ala. 2019). And while "[t]he Eleventh Circuit has recognized that the *Burlington* decision strongly suggests that it is for a jury to decide whether anything more than the most petty and trivial actions against an employee should be considered "materially adverse," *id.* at 1245 (quoting *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008)) (internal quotation marks omitted), the court concludes that, under the "circumstances of [this] particular case," Edmonds's conduct is, at best, "trivial" and does not amount to an action that would "dissuade[ ] a

reasonable worker from making or supporting a c1harge of discrimination." *Burlington*, 548 U.S. at 68.

The Rule 56 record is clear that, Plaintiff has not established that she suffered any actionable adverse action that would have dissuaded a reasonable employee from making a discrimination complaint or charge.

### 3.    Causal Connection

Even assuming, for the sake of argument, that Plaintiff could show that she suffered an actionable adverse employment action (and, to be clear, she has not made that showing), she would be required to show that the challenged employment actions were causally related to her protected conduct. She cannot do so. "A plaintiff may show a causal link with proof that "the decision-maker became aware of the protected conduct, and that there was close temporal proximity between this awareness and the adverse employment action." *Farley v. Nationwide Mut. Ins. Co*., 197 F.3d 1322, 1337 (11th Cir. 1999). But, "mere temporal proximity, without more, must be 'very close.'" *Gray v. City of Montgomery*, 756 F. Supp. 2d 1339, 1350 (M.D. Ala. 2010).

Here, Plaintiff discussed her compensation with Edmonds in the Spring of 2017, on March 20, 2018, and again on April 24, 2018. After these discussions, on October 1, 2018, Plaintiff received an $8,000.00 raise. This raise (even if it were too little and even if it could be deemed "adverse") occurred too remotely in time to establish any temporal proximity. *See Williams v. Waste Mgmt., Inc.*, 411 F. App'x 226, 229-30 (11th Cir. Jan. 25, 2011) (holding that a two-month gap between two events is enough of a delay to preclude an inference of causation). Moreover, Plaintiff's contention that the market value for the Comptroller position was lowered "[s]ince filing her EEOC complaint" is wholly unsupported in the Rule 56 record. According to

Edmonds's testimony, it was adjusted in February 2015—well before Plaintiff complained to Edmonds or filed her EEOC Charge. Simply put, there is no adverse employment action that is even arguably causally connected to any protected conduct. Consequently, the court concludes that Plaintiff has failed to establish a *prima facie* case of Title VII/EPA retaliation.

Finally, even if Plaintiff had established a *prima facie* case of retaliation (and to be clear, she has not), for the reasons discussed above regarding Plaintiff's disparate treatment gender discrimination claim, Defendant has articulated legitimate, non-retaliatory reasons for the disparity between Plaintiff's salary and Snow's salary, and Plaintiff has not shown, in any manner, that those reasons are pretextual. Therefore, Defendant's Motion for Summary Judgment (Doc. # 30) is due to be granted as to Counts Two and Four of Plaintiff's First Amended Complaint.

## IV.    Conclusion

For all the foregoing reasons, Defendant's Motion for Summary Judgment (Doc. # 30) is due to be granted. An Order consistent with this Memorandum Opinion will be entered.

**DONE** and **ORDERED** this July 24, 2020.

R. DAVID PROCTOR
UNITED STATES DISTRICT JUDGE